IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Douglas B. Drake, Sr., ) | Civil Action No. 7:02-2604-TLW-BHH |
| ) Plaintiff, ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| Aetna Life Insurance Company, ) | |
| ) Defendant. ) | |

This matter is before the Court on the parties' respective memoranda in support of judgment. In his complaint, the plaintiff is seeking long-term disability ("LTD") benefits under an employee welfare benefit plan (the "Plan") governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§1001, *et seq*. ("ERISA"). The plan is sponsored by defendant Aetna Life Insurance Company (the "defendant"), which is also the claim administrator.

The plaintiff originally filed his Complaint on August 5, 2002. Eventually, a putative settlement agreement was reached by the parties, and an order dismissing the action without prejudice was filed on August 21, 2003. Thereafter, the plaintiff refused to honor the settlement agreement alleging that his attorney did not have authority to accept its terms. After a hearing, the Honorable Terry L. Wooten denied the defendant's motion to enforce the settlement agreement. This case has continued with the plaintiff proceeding *pro se*. By stipulation, the parties have agreed to have the case resolved on the basis of the administrative record and their Memoranda in Support of Judgment, filed September 12, 2005, and October 3, 2005, respectively.

**FACTUAL BACKGROUND**

The plaintiff, Douglas Drake, is a former employee of PepsiCo. While employed there, the plaintiff was a delivery driver and salesman. (Joint Stipulation, Ex. 1 at Bates # 5000027.) The plaintiff reportedly injured his back in October, 1997, while performing his duties as a salesman. (*Id*. at Bates # 5000152). At the time of his alleged injury, the plaintiff was pulling a case of 2-liter drinks from an overhead shelf when he stepped into water on the floor. He twisted his back to avoid falling and claims he felt pain immediately thereafter. (*Id*. at Bates # 5000152). As an employee of PepsiCo, the plaintiff was eligible to participate and did participate in the long term disability plan established by PepsiCo.

The plaintiff received short term disability benefits from PepsiCo for a period of time and, sometime thereafter, the plaintiff filed a claim for long term disability benefits under the Plan. Material provisions of the Plan define total disability as follows:

> You are deemed to be totally disabled while either of the following applies to you:
>
> • In the first 24 months of a period of disability:
>
> You are not able, solely because of injury or disease, to perform the material duties of your own occupation; except that if you start work at a reasonable occupation you will no longer be deemed totally disabled.
>
> • Thereafter during such period of total disability:
>
> You are not able, solely because of injury or disease, to work at any reasonable occupation.

(Joint Stipulation, Ex. 2 at Bates ## 5000477.) "Reasonable occupation" is defined as "any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience." (*Id*.)

Based on a review of substantial medical records, the defendant determined that the plaintiff was disabled from his "own occupation," with PepsiCo, for purposes of disability benefits in the initial 24 month period (*see id*.). The defendant, therefore, certified the

2

plaintiff's disability as of March 27, 2000. The defendant notified the plaintiff of its decision by letter dated April 17, 2000. (*Id.* at Bates # 5000286.)

The defendant continued to review the plaintiff's disability as permitted by the plan. In doing so, it requested additional medical records from the plaintiff's treating physicians. As discussed in more detail *infra*, the defendant concluded that the plaintiff was not disabled to a degree that would prevent him from performing the duties of "any occupation," as is required for the plaintiff to continue receiving LTD benefits after the initial 24 month period. (*Id.* at Bates ## 5000477.)

Accordingly, the parties have stipulated that the sole inquiry is whether the plaintiff is totally disabled from "any reasonable occupation" as provided in the Plan. (*See* Joint Stipulation ¶ 7.)

## ANALYSIS

**I.    STANDARD OF REVIEW**

The parties have also stipulated that the plan bestows upon the defendant discretionary authority and, therefore, that the modified abuse of discretion standard is the appropriate standard of review in this case. (Joint Stipulation ¶ 3.) The Court, therefore, is to review the defendant's decision to deny LTD benefits for an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989); *Scipio v. United Bankshares, Inc.*, 119 Fed. Appx. 431, 434 (4th Cir. 2004). Under this standard, the defendant's decision will not be disturbed if it is reasonable, even if this Court would have come to a different conclusion independently. *See Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000).

In assessing the reasonableness of a plan administrator's decision, the Court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision

was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *See Booth v. Wal Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000); *see also Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 175 (4th Cir. 2005); *Johanssen v. District No. 1-Pacific Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 171 (4th Cir. 2002).

## II.  LAW AND DISCUSSION

The plaintiff has challenged the defendant's decision to deny benefits, primarily implicating two *Booth* factors under the modified abuse of discretion standard of review.

### A.  Reasonableness

First, the plaintiff has challenged the decision as unreasonable in light of the medical evidence. [A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metropolitan Life Ins.*, 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted); *see also Evans v. Metropolitan Life Ins. Co.*, 358 F.3d 307, 311 (4th Cir. 2004). The Court agrees with the defendant that its decision was both deliberate and principled and supported by substantial evidence.

#### i.  *Deliberate and principled review*

The defendants peformed the following deliberate and principled review in concluding that the plaintiff was capable of performing some reasonable occupation as defined under the Plan. As an initial matter, the defendant thoroughly considered all of the plaintiff's medical records, including the records of Drs. Sarmiento, Gheorghiu, Daum-Kowalski, Mironer, Visk, Rollins and Campbell, prior to the original determination that the plaintiff was unable to perform the duties of his "own occupation." During the defendant's continuing evaluation of the plaintiff's eligibility for benefits, as permitted in the Plan, it requested additional medical records from the plaintiff's treating physicians to analyze whether, after the termination of the original 24 month period, the plaintiff would be able to perform the duties of "any reasonable occupation."

On October 6, 2000, Dr. Gheorghiu completed an Attending Physician Statement ("APS"). In the APS, Dr. Gheorghui essentially concluded that the plaintiff was completely incapacitated. He stated that the plaintiff had no present capabilities and had "total physical" limitations and restrictions. (*Id*. at Bates # 5000305). Dr. Gheoghiu was the only physician who made such a recommendation.

The Court finds that the defendant explored Dr. Gheorghiu's disability recommendation in a deliberate and principled manner and ultimately rejected it on substantial evidence. In response to the October 2000 APS, the defendant sent Dr. Gheorghiu a second APS form to complete asking that he "be specific" in identifying the plaintiff's limitations. In the second APS dated May 11, 2001, Dr. Gheorghiu stated that the plaintiff's present capabilities consisted of sitting and walking for a maximum of 30 minutes at a time, that his present limitations included not bending, lifting or doing any physical work, and he again stated that the plaintiff had "total physical restriction." (*Id*. at Bates # 5000368). On the attached Functional Capacity Worksheet also completed on May 11, 2001, Dr. Gheorghiu simply drew a line down the column marked "never" indicating that Plaintiff could "never" do any of the numerous physical activities listed, including sitting, standing, walking, or lifting any amount of weight from 1 to 100+ pounds. (*Id*. at Bates # 5000369).

The defendant found the APS submissions to be at odds with the office visit notes and previous recommendations of Dr. Gheorghiu. For example, in previous records, Dr. Gheorghiu had indicated that the plaintiff, despite a 10% impairment, was still working as of September 15, 1998. (*Id*. at Bates # 5000129). On February 5, 1999, Dr. Gheorghiu scheduled a Functional Capacities Evaluation ("FCE") for Plaintiff. (*Id*. at Bates # 5000156). The results indicated that the plaintiff had a 2% impairment of the back, but that he could do frequent lifting of 11 - 25 pounds, occasional lifting of 21 - 50 pounds and constant lifting of 1 - 10 pounds. With these restrictions the plaintiff was capable of working in the medium category of jobs. (*Id*. at Bates ## 5000184-5000185).

In March of 1999, Dr. Gheorghiu stated that the plaintiff had a 15% impairment, but suggested that the plaintiff was, nonetheless, capable of performing his upcoming "spare

man" position at work. (*Id*. at Bates # 5000171). In fact, the only references to the plaintiff's inability to work were submitted by Dr. Gheorghiu after the plaintiff indicated that he was applying for disability. In his April 23, 1999 office visit notes, Dr. Gheorghiu stated that the plaintiff, who was in the office for completion of his disability application, was "significantly disabled." (*Id*. at Bates # 5000172.) Ironically, on that same day Dr. Gheorghiu also completed a Physician Interview form stating that the plaintiff could return to work "light duty" subject to bending and lifting restrictions. (*Id*. at Bates # 5000175).

The disconnect between these records and the two APS forms completed by Dr. Gheorghiu, in October 2000 and May 2001 respectively, justified the defendant's continuing suspicions. Accordingly, Lynn Jenkins, a medical consultant for the defendant, called the plaintiff and wrote a letter to Dr. Gheorghiu for clarification of the plaintiff's restrictions and limitations as described in the APSs. (*Id*. at Bates ## 5000356, 5000360). On May 30, 2001, Ms. Jenkins spoke to the plaintiff who indicated that he was not planning to return to work, that he did not know what he could do and that he "can only sit 1 hour, stand 10-15 minutes, [and] walk short distances." (*Id*. at Bates # 5000358).

On June 1, 2001, Ms. Jenkins sent a letter to Dr. Gheorghiu questioning the inconsistencies between his APS opinions and the results of his prior FCE, in February of 1999. Specifically, she asked, "It is unclear why Mr. Drake's condition has deteriorated to such a degree when he has not been working. Is it possible that he may have light or medium work capacity? Would a Functional Capacity Evaluation be appropriate at this time? Please comment." (*Id*. at Bates # 5000360). In a brief response that appears to have been sent on June 4, 2001, Dr. Gheorghiu stated, "He is still just as incapacitated as before. His pain is under control with medication, but he would be unable to restart working; I don't think another FCE would help." (*Id*. at Bates # 5000365). Dr. Gheorghiu did not elucidate his opinion that the plaintiff could "never" do any activity, even sitting, based on changes he had observed in the plaintiff's medical condition.

Accordingly, the defendant requested that a second FCE be conducted on July 17, 2001. (*Id*. at Bates # 5000377). Contrary to Dr. Gheorghiu's assertions in the APSs, the

6

July FCE revealed that the plaintiff was capable of lifting in the light category of work. It concluded that he could perform light work for 8 hours per day and could even lift in the medium category "frequently." (*Id*. at Bates # 5000395 – 5000396).

Finally, in assessing the plaintiff's claim, Aetna referred the plaintiff's file to a vocational consultant who evaluated the plaintiff's employment history and education level, his restrictions and limitations, and transferable skills. Based on those factors, the consultant compiled a list of jobs that existed in the plaintiff's geographical area that he would be able to do taking into account his restrictions and limitations, and for which the plaintiff was qualified by education and experience. (*Id*. at Bates # 5000428-5000430 and 5000432).[1]

The Court finds these efforts to be substantially thorough and, in the least, deliberate and principled.

### ii. *Substantial Evidence*

In addition to performing a deliberate and principled review, the defendant's conclusion based on that review was supported by substantial evidence, much of which has already been recited above. The records do not identify any restrictions or limitations that would preclude the plaintiff from performing certain occupations, namely sedentary ones. Again, to be disabled after 24 months under the Plan, the plaintiff must be unable to perform the duties of "any reasonable occupation." (Joint Stipulation, Ex. 2 at Bates ## 5000477.) In fact, several of the records state that the plaintiff was capable of performing a job in the more challenging light to medium category of work. Indeed, the plaintiff's treating physicians', on several occasions, concluded that the plaintiff's condition was such that he could continue or return to work. (*See* Joint Stipulation, Exs. 1 & 2 at Bates ## 50000092-93, 5000132, 5000145, 5000175, 5000224, 5000406). Likewise, the FCE results

---

[1] In addition to reviewing the plaintiff's medical records and conducting the second FCE, the defendant apparently reviewed surveillance videos and reports of the plaintiff's conduct on July 16, 17, and 18, 2001. The videos purportedly demonstrate that the plaintiff can engage in conduct such as sitting and walking which Dr. Gheorghiu stated he could "never" do (*see id*. at Bates # 5000369). The Court makes no finding as to whether such activity constitutes a component of a principled and reasoned review.

7

indicate that Plaintiff could perform at least sedentary work, and possibly light to medium work with lifting restrictions. (*See Id.* at Bates ## 5000184-185, 5000395-396).

Further, although the plaintiff suggested that he did not intend to return to work because he did not know what he could do (*see id.* at Bates # 5000358), the defendant identified several jobs in the plaintiff's geographical area, for which the plaintiff was qualified, and that the plaintiff could perform in light of his restrictions and limitations. (Id. at Bates # 5000432). Those jobs included general merchandise salesperson, telemarketer, security guard, outside deliverer, automobile rental clerk, and recreational facility attendant. (*Id*. and at Bates # 5000432). This evidence in conjunction with the discrepancies in Dr. Gheorghiu's is substantial.

While there is substantial evidence in the administrative record to support the defendant's decision that the plaintiff is not entitled to long term disability benefits under the Plan, there is minimal evidence to support the plaintiff's contention that he is unable to perform any reasonable occupation. Only in the context of "disability" questionnaires has Dr. Gheorghiu indicated that the plaintiff cannot work. As stated, Dr. Gheorghiu's assessments seem somewhat exaggerated when compared to his own prior records and the objective evidence in the administrative record. The office visit notes do not reflect specific clinical findings indicative of a decline in the plaintiff's condition which would justify the discrepancies between his various assessments; Dr. Gheorghiu simply concludes that the plaintiff is physically incapacitated. (*See id.* at Bates # 5000305). As discussed, the defendant did not peremptorily disregard Dr. Gheorghiu's APS conclusions. The doctor was simply unable to provide the defendant with an explanation, from a clinical standpoint, as to why the plaintiff could no longer work under any circumstances.

For all these reasons, the decision of the defendant was reasonable. None of the other *Booth* factors recommend a contrary conclusion. The plaintiff has not argued otherwise.

### iii.  *Treating Physician Rule*

The plaintiff does complain that the opinion of Dr. Gheorghiu, as his treating physician, was not given sufficient weight. It does not appear, however, that the Fourth Circuit has adopted, in ERISA cases, a "treating physician" rule, which would create a rebuttable presumption for opinions of treating physicians. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607-08 (4th Cir. 1999); *see also Dwyer v. Metropolitan Life Ins. Co.*, 4 Fed. Appx. 133, 139-141 (4th Cir. 2001). Even still, the Fourth Circuit has noted that such a rule "only requires an award of benefits based upon a treating doctor's opinion of disability *absent persuasive contradictory evidence*." *Id*. Moreover, in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the United States Supreme Court held:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id*. As noted, the defendant relied on "persuasive contradictory evidence" to reject the opinion of Dr. Gheorghiu.

### B.    The Defendant's Conflict of Interest

Second, as the plaintiff complains, this case implicates the eighth *Booth* factor insofar as the defendant suffers from a conflict of interest by being both the insurer and administrator of the plan. (Def.'s Mem. Supp. J. at 4-5.) This type of conflict flows inherently from the nature of the relationship entered into by the parties and is common where employers contract with insurance companies to provide and administer health care benefits to employees through group insurance contracts. *See Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 86 (4th Cir.1993). Because the plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, the Court must also weigh that conflict "in determining whether there [has been] an abuse of discretion."

*Firestone*, 489 U.S. at 115; *see Booth v. Wal Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir.2000).

The Court, therefore, is to apply a "sliding scale" and reduce the amount of deference given to the fiduciary's decision and determine, based on review of the record before the fiduciary at the time of decision-making, whether the fiduciary's decision is consistent with a decision that might have been made by a fiduciary acting free of the interests that conflict with those of the beneficiaries. *See Ellis*, 126 F.3d at 233. Specifically, "the more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Id*. Therefore, the court is to review the defendant's discretionary decision for abuse of discretion, subject to the "sliding scale" of additional scrutiny.

The Court's review, however, is confined to determining whether the defendant's decision was objectively reasonable. *See Friz v. J & H Marsh & McLennan, Inc.*, 2 Fed. Appx. 277, 282 (4th Cir. 2001) (citing *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir.1999)). Applying this standard, for essentially the same reasons set forth above, the Court concludes that the defendant's decision was *objectively* reasonable as a matter of law. *See Friz*, 2 Fed. Appx. at 282. Said differently, an administrator free of bias could have arrived at the same decision based on the evidence of record, as analyzed above.

Moreover, the benefit to the defendant to act on any conflict of interest is not compelling. The defendant had already been paying the plaintiff LTD benefits and would only be obligated to the plaintiff in the amount of $719.87 per month as a result of any unfavorable decision, although admittedly for an indefinite period. (Joint Stipulation ¶ 9.) Any discount the Court might apply as a result of the conflict, therefore, would be insufficient to disturb the conclusion that the defendant's decision was otherwise objectively reasonable based on the record.

## **CONCLUSION**

Wherefore, it is hereby recommended that the judgment of the defendant denying the plaintiff long-term disability benefits under the relevant employee welfare benefit plan be AFFIRMED based upon the parties' respective memoranda in support of judgment and the administrative record.

s/Bruce H. Hendricks<br>
United States Magistrate Judge

March 7, 2006
Greenville, South Carolina